Citation Nr: 1743990 
Decision Date: 09/18/17 Archive Date: 10/10/17

DOCKET NO. 13-23 003 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Phoenix, Arizona


THE ISSUES

1. Entitlement to a compensable initial rating for hearing loss.

2. Entitlement to a compensable initial rating for a right long finger with mild lateral flexion deformity disability, to include osteoarthritis. 

3. Entitlement to service connection for a disability manifested by coughing, to include bronchitis. 


REPRESENTATION

Appellant represented by: The American Legion


ATTORNEY FOR THE BOARD

E. Alexander Neff, Associate Counsel 

INTRODUCTION

The Veteran served on active duty in the Marine Corps from April 1968 to February 1970. His awards and decorations included: a National Defense Service Medal; a Vietnam Campaign Medal with Device; and a Vietnam Service Metal with two Bronze stars. The Board sincerely thanks him for his service to our country. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from an October 2012 decision of the Department of Veterans Affairs (VA) Regional Office (RO) in San Diego, California, which, in part, granted service connection for bilateral hearing loss, and a right long finger deformity, and denied service connection for cough.

The issue of entitlement to service connection for a disability manifested by coughing is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran's bilateral hearing loss has manifested in no greater than Level I hearing impairment in both the right and left ear.

2. The Veteran has a mild lateral flexion deformity of the right long finger and osteoarthritis. There is a gap of less than one inch between the fingertip and the crease of the palm, and extension is not limited by more than 30 degrees.


CONCLUSIONS OF LAW

1. The criteria for a compensable rating for bilateral hearing loss disability have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.321, 4.85, Diagnostic Code 6100 (2016).

2. A compensable rating for a right long finger with mild lateral flexion deformity, to include osteoarthritis, is not warranted. 38 U.S.C.A. §§ 1155, 5107; 38 C.F.R. § 4.71a, Diagnostic Code 5229.


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Legal Criteria

A. The Veterans Claims Assistance Act of 2000 (VCAA)

VA has duties to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a). 

Regarding the Veteran's claims for higher ratings for a right long finger disability and bilateral hearing loss, these appeals arise from the Veteran's disagreement with the initial evaluation following the grant of service connection. Once service connection is granted the claim is substantiated, additional notice is not required, and any defect in the notice is not prejudicial. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). No additional discussion of the duty to notify is therefore required. 

The Board has reviewed all of the evidence in the Veteran's record. Although the Board is required to provide reasons and bases supporting its decision, there is no need to discuss each item of evidence in the record. The Board will summarize the pertinent evidence as deemed appropriate, and the Board's analysis will focus specifically on what the evidence of record shows, or does not show, with respect to the claim. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000).

B. Higher Rating

Disability ratings are assigned in accordance with VA's Schedule for Rating Disabilities and are intended to represent the average impairment of earning capacity resulting from a disability. See 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.321(a), 4.1. When a question arises as to which of two ratings shall be applied under a particular diagnostic code, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for the higher rating; otherwise, the lower rating will be assigned. See 38 C.F.R. § 4.7. 

Where, as here, the rating appealed is the initial rating assigned with a grant of service connection, the entire appeal period is for consideration, and separate ratings may be assigned for separate periods of time based on facts found, a practice known as "staged ratings." Moreover, adjudication of a claim for a higher initial disability rating should include specific consideration of whether staged ratings are appropriate. See Fenderson v. West, 12 Vet. App, 119 (1999). 

II. Higher Rating: Bilateral Hearing Loss

A. Rating Criteria

Disability ratings for hearing loss are derived by a mechanical application of the rating schedule to the numeric designations assigned after audiometric evaluations are performed. See Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992). Hearing loss disability ratings range from noncompensable to 100 percent based on organic impairment of hearing acuity, as measured by controlled speech discrimination tests in conjunction with the average hearing threshold, as measured by pure tone audiometric tests in the frequencies 1,000, 2,000, 3,000 and 4,000 cycles per second.

The Rating Schedule provides a table (Table VI) to determine for rating purposes a Roman numeral designation (I through XI) for hearing impairment, based on testing (by a state-licensed audiologist) including pure tone thresholds and speech discrimination (Maryland CNC test). See 38 C.F.R. § 4.85. Where the examiner certifies that use of the speech discrimination test is not appropriate because of language difficulties, inconsistent speech discrimination scores, etc., or when there is an exceptional pattern of hearing impairment (as defined in 38 C.F.R. § 4.86) the rating may be based solely on pure tone threshold testing. See 38 C.F.R. § 4.85, Table VIA.

The rating schedule establishes 11 auditory acuity levels designated from Level I for essentially normal hearing acuity, through Level XI for profound deafness. VA audiometric examinations are conducted using a controlled speech discrimination test together with the results of a pure tone audiometric test. The horizontal lines in Table VI (in 38 C.F.R. § 4.85) represent nine categories of the percentage of discrimination based on the controlled speech discrimination test. The vertical columns in Table VI represent nine categories of decibel loss based on the pure tone audiometric test. The numeric designation of impaired hearing (Levels I through XI) is determined for each ear by intersecting the horizontal row appropriate for the percentage of discrimination and the vertical column appropriate to the pure tone decibel loss.

The percentage evaluation is found from Table VII (in 38 C.F.R. § 4.85) by intersecting the horizontal row appropriate for the numeric designation for the ear having the better hearing acuity and the appropriate vertical column to the numeric designation level for the ear having the poorer hearing acuity. See 38 C.F.R. § 4.85(e).

The provisions of 38 C.F.R. § 4.86(a) provide that when the pure tone threshold at each of the four specified frequencies (1000, 2000, 3000, and 4000 Hertz) is 55 decibels or more, the rating specialist will determine the Roman numeral designation for hearing impairment from either Table VI or Table VIA, whichever results in the higher numeral. Each ear will be evaluated separately. The provisions of 38 C.F.R. § 4.86(b) provide that when the pure tone threshold is 30 decibels or less at 1,000 hertz, and 70 decibels or more at 2,000 hertz, the rating specialist will determine the Roman numeral designation for hearing impairment from either Table VI or Table VIA, whichever result provides the higher numeral. That numeral will then be elevated to the next higher Roman numeral. Each ear will be evaluated separately.

B. 
Factual Background and Analysis

An August 2012 VA audiological examination report was completed for the purposes of evaluating the Veteran's hearing acuity in each ear. The August 2012 VA examination report reveals that relevant pure tone thresholds, in decibels, following air conduction testing were as follows:




HERTZ



500
1000
2000
3000
4000
RIGHT
15
5
15
50
40
LEFT
15
10
20
60
60

The Veteran's average puretone threshold for the right ear was 27.5 decibels with a word recognition score of 96 percent. His average puretone threshold for the left ear was 37.5 decibels with a word recognition score of 92 percent. 

A bone conduction study was also conducted at the August 2012 examination. Regarding the Veteran's hearing loss, the VA examiner opined that an air conduction study was better than a bone conduction study on the bases that the air conduction study was the better study to reflect the Veteran's hearing loss. The August 2012 VA examination report reveals that relevant pure tone thresholds, in decibels, following bone conduction study were as follows:




HERTZ



500
1000
2000
3000
4000
RIGHT
10
0
15
50
40
LEFT
10
0
20
50
60

Notably, as the results of the air conduction study are more favorable to the Veteran, so the Board shall rely upon those findings in its determination. 

Applying 38 C.F.R. § 4.85, Table VI to the August 2012 VA audiology air conduction data: the Veteran's right ear hearing loss is a Level I impairment, and the left ear hearing loss is a Level I impairment. The Board has considered the provisions of 38 C.F.R. § 4.86, and finds that they do not apply as no exceptional pattern of hearing impairment is shown. Applying the hearing levels from Table VI to Table VII, based on the results of the August 2012 audiogram examination findings, a noncompensable rating is derived.

In the November 2012 Notice of disagreement, the Veteran claimed that his rating for hearing loss did not contain an explanation as to its evaluation. 

In a November 2014 statement, the Veteran stated that his bilateral hearing loss had worsened. 

A December 2014 VA audiological examination report was completed for the purposes of evaluating the Veteran's hearing acuity in each ear. The December 2014 VA examination report reveals that relevant pure tone thresholds, in decibels, following audiometric testing were as follows:




HERTZ



500
1000
2000
3000
4000
RIGHT
20
15
25
55
60
LEFT
15
15
30
70
65

The Veteran's average puretone threshold for the right ear was 39 decibels with a word recognition score of 96 percent. His average puretone threshold for the left ear was 45 decibels with a word recognition score of 96 percent. 

Applying 38 C.F.R. § 4.85, Table VI to the December 2014 VA audiology data: the Veteran's right ear hearing loss is a Level I impairment, and the left ear hearing loss is a Level I impairment. The Board has considered the provisions of 38 C.F.R. § 4.86, and finds that they do not apply as no exceptional pattern of hearing impairment is shown. Applying the hearing levels from Table VI to Table VII, based on the results of the December 2014 audiogram examination findings, a noncompensable rating is derived.

The Board acknowledges the Veteran's November 2012 concern regarding the August 2012 VA examiner's findings. The Board notes that review of this record shows that the VA examiner reviewed the Veteran's medical records, recorded and considered the Veteran's statements, and provided two sets of audiological findings, air and bone conduction. As such the Board finds that the August 2012 VA examination is adequate for rating purposes. 

The Board finds that the audiometric reports discussed above are highly probative evidence in evaluating the severity of the Veteran's hearing loss. The August 2012 and December 2014 VA examination reports discussed above are not contradicted by any other probative evidence (no other evidence of record shows audiometric findings meeting the criteria to allow rating for hearing loss). Thus, the Board finds the VA examination reports to be persuasive in showing that the Veteran's hearing loss has not met the criteria for a compensable rating during the appeal period. As such, a compensable rating for bilateral hearing loss is not warranted. 

The Board finds that none of the other pertinent medical evidence of record presents findings significantly contrary to those in the most detailed evidence discussed above featuring specialized audiometric measurements of the Veteran's hearing acuity. Nor does any other evidence of record otherwise probatively indicate that the criteria for an increase of the disability rating for hearing loss during the appeal period. This case presents the Board with a situation in which all of the probative competent audiological evidence shows audiometric data that fails to meet the quantitative criteria for a compensable disability rating. The audiometric reports of record reflect the testing and reporting of trained audiology professionals who are competent to prepare such reports. The Board notes that there is no indication that the audiometric reports of record are anything but reliable. 

The Board notes that in the August 2012 VA examination the Veteran reported difficulty with speech and hearing in noisy environments. The Board also notes that on the December 2014 VA examination the Veteran reported that he had difficulty hearing people. He would ask them to repeat themselves, especially if there was a "little bit" of noise. He turned the television up if other people were speaking in the room he was watching it in. The Veteran's lay testimony is credible evidence and competent to describe his difficulty hearing and the effect of his hearing while speaking to others, using the telephone, and watching television, and the Board has taken the functional effects of this disability into consideration. See Martinak v. Nicholson, 21 Vet. App. 447 (2007). The Board understands the Veteran's belief that the severity of his hearing loss should warrant a compensable disability rating and the Board recognizes the frustration caused by the described difficulties. However, schedular disability ratings for hearing loss are derived by a mechanical application of the rating schedule to the numeric designations assigned after audiometric evaluations are performed. See Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992). The Board must rely upon specialized audiometric evaluations to assess the medical severity of the Veteran's hearing loss. 

III. Higher Rating: Right Long Finger

A. Rating Criteria

A non-compensable rating is assigned where the disability is manifested by a gap of less than one inch (2.5 cm.) between the fingertip and the proximal transverse crease of the palm, with the finger flexed to the extent possible, and; extension is limited by no more than 30 degrees. 38 C.F.R. § 4.71a, Diagnostic Code 5229. 

A 10 percent evaluation may be assigned for limitation of motion of the index or long finger of the major or minor extremity with a gap of one inch (2.5 cm.) or more between the fingertip and the proximal transverse crease of the palm, with the finger flexed to the extent possible, or; with extension limited by more than 30 degrees. Id. 

A 10 percent evaluation may be assigned for favorable or unfavorable ankylosis of the long finger. 38 C.F.R. § 4.71a, Diagnostic Code 5226.

A 10 percent evaluation may be assigned for the amputation of the long finger of the major or minor extremity without metacarpal resection, at proximal interphalangeal joint or proximal thereto. 38 C.F.R. § 4.71a, Diagnostic Code 5154.

A 20 percent evaluation may be assigned for amputation of the long finger of the major or minor extremity with metacarpal resection (more than one-half of the bone lost). Id. 

B. Factual Background and Analysis

In the August 2012 VA hand and finger examination, the Veteran complained of intermittent lateral locking of the distal phalanx of the right long finger. This would cause the Veteran to pull on the finger to straighten it out. He would experience flare ups of intermittent pain and locking when grasping or "making a grip." He had difficulty grasping the steering wheel of his truck due to this locking. 

Upon examination, the VA examiner found that there was limitation of motion of the long finger. The Veteran had the ability to oppose his right thumb, with the gap between the fingers and the thumb pad being less than one inch. There was objective evidence of painful motion beginning at a gap of less than one inch. There was gap of less than one inch between his long finger and the proximal traverse crease of the palm. Painful motion here began at a gap of less than one inch. The long finger was limited to extension by no more than 30 degrees. 

He was able to perform repetitive use testing without any additional limitation of motion of the fingers. Afterwards the gap between his thumb and fingers and between the long fingertip and the proximal traverse crease was less than one inch. Post repetitive use testing, the extension of the long finger was limited by no more than 30 degrees. The VA examiner noted that there was a functional loss post repetitive use testing of less movement than normal, pain on movement, and deformity of the right long finger. The Veteran experienced pain to palpation of the joints/soft tissue. Muscle strength testing noted 5/5 hand grip strength in the right hand. The Veteran was not found to have ankylosis, scars, or other pertinent physical findings. He did not use assistive devices regarding his right fingers. The VA examiner found that the right long finger did not have a functional impairment such that no effective function remained other than that which would be equally well served by an amputation or prosthesis. 

Upon review of imaging studies, the VA examiner found that the Veteran had degenerative/traumatic arthritis. He noted that the bones were normally aligned and intact. There was observed periarticular osteopenia, and minimal spurring from articular margins. There was a narrowing of the joint spaces in the navicular, trapezium, trapezoid, distal interphalangeal joint, and third metacarpophalangeal joint. Soft tissues were unremarkable. The Veteran was diagnosed with osteoarthritis of the hand status post right long finger injury. The VA examiner opined that a mild lateral flexion deformity of the distal phalanx of the right long finger was at least as likely as not related to service. 

In the November 2012 Notice of disagreement, the Veteran claimed that his finger had nerve damage. He additionally reported that he had a "substantial" loss of flexion, loss of "gripping (fine articulation)" in this finger. 

Upon consideration of the evidence, the Board finds that a compensable rating during the appeal period is not warranted. The Veteran's right long finger disability is primarily manifested by pain and a mild lateral flexion deformity. The August 2012 examination demonstrated there is a gap between the fingertip and the crease of the palm of less than one inch, and that extension was limited by no more than 30 degrees even after repetitive testing. Under Diagnostic Code 5229, in order to assign a compensable rating, there must be a gap of one inch or more or limitation of extension by more than 30 degrees. Such findings have not been shown by the evidence of record. As such, a compensable rating under Diagnostic Code 5229 is not warranted. 

Additionally, in the August 2012 VA examination the Veteran's right long finger disability has not shown to be manifested by any ankylosis, or be functionally equivalent to amputation, and that there are no other pertinent physical findings (such as a neurological problem as suggested by the Veteran). The Board has considered the competent and credible medical evidence to determine whether any additional functional loss due to pain and weakness on use results in impairment/disability equivalent to amputation. Functional impairment comparable to amputation is simply not shown. As such, a compensable rating pursuant to Diagnostic Codes 5154 and 5226 are not warranted. 

The Board acknowledges the Veteran's November 2012 statement that he had nerve damage and a loss of gripping in his right long finger. Although lay persons are competent to provide opinions on some medical issues, such as generally experiencing pain and loss of dexterity, the specific issues in this case (the severity of a joint deformity and/or arthritis) fall outside of the realm of common knowledge of a lay person. See Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011); Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007) (lay persons not competent to diagnose cancer). Given the complexity of the medical question at issue in this matter the Veteran, who is not shown to have the necessary education, training, or experience, is not competent to opine as to etiology of his symptoms, or diagnose nerve damage. The determination of the severity of arthritis and/or joint deformity is a matter of medical complexity, and, therefore, the Veteran's statements suggesting a diagnosis and/or etiology of symptoms in this matter do not constitute probative evidence. Further, to the extent that the Veteran claims that he has nerve damage, the August 2012 VA examiner found that the Veteran had normal muscle strength in his right hand and had no other pertinent physical findings, signs, or symptoms related to the fingers. Thus, to the extent that his lay statements assert the severity of the above noted symptoms, or an unsupported diagnosis of nerve damage, they are not competent evidence in support of his claim. 

In summation, the weight of the competent and credible evidence is against a finding that the Veteran's right long finger disability warrants a compensable rating during the period on appeal. 


ORDER

A compensable rating for bilateral hearing loss is denied.

A compensable rating for a right long finger with mild lateral flexion deformity disability, to include osteoarthritis, is denied. 


REMAND

Upon review of the record, the Board observes that additional development is necessary to properly adjudicate the Veteran's claim for his claimed coughing disability. The Board observes that the Veteran has not undergone a VA examination to determine the etiology of his diagnosed bronchitis. As such, a VA examination is necessary to determine the etiology of the Veteran's claimed coughing disability. 

For the following reasons the Board finds that an examination is necessary to decide the claim. See 38 C.F.R. § 3.159(c)(4); see also McLendon v. Nicholson, 20 Vet. App. 79 (2006). In a February 1970 STR, the Veteran complained of chest pain. Post-service medical records since October 1995 have noted that the Veteran have shown complaints and symptoms of coughing and was diagnosed with bronchitis. Since then, he has been consistently found with/diagnosed with chronic bronchitis. In a December 2012 VA medical record noted that an ear, nose, and throat specialist believed that the Veteran's coughing may be related to an abnormal closing of epiglottis. In the August 2012 and December 2014 VA hearing loss examinations, the Veteran reported that he was involved in combat in Vietnam. He served at an artillery battery, and worked with, and in the vicinity of, diesel vehicles. He was exposed to incoming rocket and mortar fire. In light of the foregoing facts, the Board finds that the low threshold has been met for triggering the Secretary's duty to assist by providing medical examinations to address the question of whether the Veteran has a lung disability that is related to his military service.

Additionally, the record suggests that there may be some outstanding medical records pertinent to the resolution of the Veteran's claim. Specifically, a December 2012 VA medical record discussed an ear, nose, and throat report that suggested that the Veteran had a potential epiglottis issue, and a January 2013 VA medical record discussed a negative CT scan report. However, these records do not appear to be associated with the record. As such, the Board finds that remand is appropriate to obtain these records. 

Accordingly, the case is REMANDED for the following action:

1. Please request the Veteran to provide names and addresses of all medical care providers who have treated his chronic cough symptoms since service, and provide him with the opportunity to submit additional records in support of his claim of service connection for his claimed coughing disability. 
 
2. Please obtain any outstanding VA treatment records related to the Veteran's cough symptoms that have not yet been associated with the claims file. 
 
3. Please obtain the ENT record suggesting that the Veteran may have a potential epiglottis issue that was discussed in the December 2012 VA medical record, and the negative CT scan report that was discussed in the January 2013 VA medical record. If any of the requested records are unavailable, or the search for such records yields negative results, it should be so noted in the record, along with an explanation for the negative result.

4. After # 1, 2, and 3 are completed, please schedule the Veteran for an examination with an appropriate VA examiner to determine to address the current nature and likely etiology of any diagnosed cough-related condition, to include bronchitis and epiglottis disability. The examiner should, upon review of the medical record and physical examination, provide opinions with supporting rationales as to the following: 

a. Does the Veteran have a current epiglottis disability? Please consider the December 2012 VA medical record that discussed an ENT's impression that the Veteran's cough may be related to an epiglottis condition. 
b. Is it at least as likely as not (50 percent probability or higher) that the Veteran has a disability with cough symptoms, to include bronchitis and any diagnosis found in (a) related to the epiglottis, that had its onset in service or was otherwise related to service? Please consider and discuss as necessary the Veteran's February 1970 complaint of chest pain; the Veteran's statements relating to his service in Vietnam; and an April 2013 private medical record that opined the Veteran's cough was secondary to his non-service connected obstructive sleep apnea. 

The claims file should be made available to and reviewed by the examiner. The examiner must explain the rationale for all opinions rendered, citing to supporting factual data and/or medical literature, as appropriate.

If the examiner cannot provide an opinion without resort to speculation, the clinician should provide an explanation as to why this is so and note what, if any, additional evidence would permit such an opinion to be made.

5. Finally, please readjudicate the claim. If the claim remains denied, issue an appropriate supplemental statement of the case and afford the Veteran and his representative the opportunity to respond. The case should then be returned to the Board, if in order, for further review.

The Veteran has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



_________________________________________________
M. C. GRAHAM
Veterans Law Judge, Board of Veterans' Appeals

Under 38 U.S.C.A. § 7252 (West 2014), only a decision of the Board of Veterans' Appeals is appealable to the United States Court of Appeals for Veterans Claims. This remand is in the nature of a preliminary order and does not constitute a decision of the Board on the merits of your appeal. 38 C.F.R. § 20.1100(b) (2016).



Department of Veterans Affairs